## UNITED STATES DISTRICT COURT
## NOTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| RUTGERS CASUALTY INSURANCE COMPANY, individually and on behalf of all others similarly situated, | ) Civil Action No.   10 - 5106 ) ) ) CLASS ACTION COMPLAINT |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| JOHN P. CALAMOS, SR., Trustee of the Calamos Convertible and High Income Fund, NICK P. CALAMOS, former Trustee of the Calamos Convertible and High Income Fund, WESTON W. MARSH, Trustee of the Calamos Convertible and High Income Fund, JOE F. HANAUER, former Trustee of the Calamos Convertible and High Income Fund, JOHN E. NEAL, Trustee of the Calamos Convertible and High Income Fund, WILLIAM R. RYBAK, Trustee of the Calamos Convertible and High Income Fund, STEPHEN B. TIMBERS, Trustee of the Calamos Convertible and High Income Fund, DAVID D. TRIPPLE, Trustee of the Calamos Convertible and High Income Fund, CALAMOS ADVISORS, LLC, an investment advisor and Delaware limited liability company, CALAMOS ASSET MANAGEMENT, INC, a Delaware corporation and publicly-held holding company, CALAMOS CONVERTIBLE AND HIGH INCOME FUND, a Delaware statutory trust, and JOHN AND JANE DOES 1-100, | ) **JURY TRIAL DEMANDED** ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Plaintiff Rutgers Casualty Insurance Company ("Plaintiff"), by and through its attorneys, alleges on personal knowledge as to all facts related to itself and on information and belief as to all other matters, as follows:

## I. INTRODUCTION

1.    Plaintiff Rutgers Casualty Insurance Company brings this class action for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment, on behalf of itself and all other individuals or entities who were beneficial owners of common shares of the Calamos Convertible and High Income Fund (the "Fund") at any time from March 19, 2008 through the present (the "Class Period"). The Fund is a closed-end investment company organized under the laws of the state of Delaware on March 12, 2003. The Fund raised money from the sale of its common shares, which it invested in securities to earn a yield for the common shareholders.

2.    In addition to the issuance of common stock, the Fund also issued auction rate preferred shares ("ARPS"). The ARPS bore a preferred dividend right, with the dividend rate reset periodically through an auction mechanism. The ARPS were advantageous for several reasons: (i) they provided the Fund with long-term financing at short-term interest rates, (*see* Prospectus, Calamos Convertible and High Income Fund, filed with the SEC on July 28, 2003, at 22 (hereinafter "2003 Prospectus")); (ii) they provided liquidity to the holders of ARPS, as they were able to sell their ARPS at auction, although there was no express obligation to provide liquidity, (*id.* at cover page, 22-23); (iii) they provided flexibility to the Fund as ARPS were subject to lower coverage ratios than debt; and (iv) they were perpetual because they had no maturity and did not ever have to be repaid.

3.    Despite the many benefits provided by the ARPS, which inured to the benefit of the Class, during 2008 the Individual Defendants caused the Fund to partially redeem the ARPS and

2

replace them with less favorable debt financing. The Individual Defendants took these actions to further their own interests and those of the Fund's investment advisor and its affiliates, not the interests of the common shareholders. They thereby breached their fiduciary duties owed to the Fund's common shareholders.

4. By this action, Plaintiff seeks to recover the damages it and the Class has sustained as a result of this conduct.

5. Plaintiff does not assert any claim arising from a misstatement or omission in connection with the purchase or sale of a security, nor does Plaintiff allege that Defendants engaged in fraud in connection with the purchase or sale of a security.

## II. PARTIES

**A. Plaintiff**

6. **Plaintiff Rutgers Casualty Insurance Company** is a resident of the State of New Jersey. Plaintiff has owned common shares in the Fund since 2003.

**B. Defendants**

7. **Individual Defendant Trustees of the Calamos Convertible and High Income Fund ("Individual Defendants").** The Fund is managed by its Board of Trustees, which is charged with responsibility for the overall management and supervision of the Fund's affairs. The Board of Trustees during the Class Period was comprised of the following individuals:

(a) John P. Calamos, Sr., Trustee and President of the Fund;

(b) Weston W. Marsh, Trustee of the Fund;

(c) John E. Neal, Trustee of the Fund;

(d) William R. Rybak, Trustee of the Fund;

(e) Stephen B. Timbers, Trustee of the Fund;

3

(f)    David D. Tripple, Trust of the Fund;

(g)    Joe F. Hanauer, former Trustee of the Fund until his retirement on December 31, 2009;

(h)    Nick P. Calamos, was a Trustee of the Fund until his resignation effective June 28, 2006 and was a Vice President of the Fund since 2003;

(i)    John and Jane Doe Defendants 1-100, individuals who aided and abetted the named Defendants in undertaking the violations alleged herein, the identities of whom are unknown to Plaintiff at this time.

**C.**    **Other Defendants ("Calamos Defendants")**

(i)    Defendant Calamos Advisors, LLC, an investment advisor and Delaware limited liability company;

(j)    Defendant Calamos Asset Management, Inc., ("CAM") a Delaware corporation and publicly-held holding company,

(k)    Defendant Calamos Convertible and High Income Fund, a Delaware statutory trust.

### III. JURISDICTION AND VENUE

8.    This is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

9.    This Court has jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d)(2)(A) in that: (i) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and (ii) this is a class action in which a member of a class of plaintiffs is a citizen of a State different from a defendant.

10.    Upon information and belief, Plaintiff specifically avers that fewer than one-third of the members of the Class are citizens of Illinois, where this action is filed.

4

11.     This Court has personal jurisdiction over Defendants in that they have their principal place of business in this State, engaged in this State in conduct giving rise to the claims asserted herein, and derive substantial benefit from services provided in this State.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. Calamos Advisors, LLC is located in Naperville, Illinois.

## IV. FACTS

### A. Background

### (i)    The Calamos Convertible and High-Income Fund

13.     The Calamos Convertible and High Income Fund (the "Fund") is an investment company subject to the Investment Company Act of 1940, as amended (the "ICA"). The Fund's stated primary investment objective is to provide total return through a "combination of capital appreciation and current income."

14.     The Fund issued six series of ARPS, designated by letters and numbers (Series M, Series TU, Series W, Series TH, Series F and Series A). Each is intended to be auctioned periodically. The terms governing each contemplate that auctions may fail. In addition, in accordance with the ICA, the holders of the 17,200 ARPS outstanding were entitled to vote for two of the trustees of the Fund.

15.     The ARPS issued by the Fund were considered favorable financing for the Fund's common shareholders for several reasons described below:

(a)     The interest rate and other costs were very favorable. While auctions cleared, the rates were set weekly by the open market (subject to a maximum rate determined by a formula, referred to herein as the "Defined Rate"), at rates that tended to be only slightly above money-market yields. In the event of failed auctions, the interest was set at the Defined Rate.

After the auction failures in 2008 described below, the Defined Rate for the ARPS was actually lower than market rates that had prevailed over periods before the auction failures. As the Fund stated in its June 2008 semi-annual report, "[o]verall, common shareholders benefited [sic] from the Fund's use of ARPS .... [W]hile the auction failures caused the rates of ARPS to rise above short-term benchmarks, the cost of leverage actually came down during the reporting period significantly (in the neighborhood of 200 to 300 basis points)." Form N-CSR, Calamos Convertible & High Income Fund, for the period ended April 30, 2008, filed with the Securities and Exchange Commission on June 26, 2008, at 8 (hereinafter "N-CSR").

(b)     Additionally, ARPS financing was very favorable to the Fund in that it was perpetual. ARPS need not ever be repaid. This was particularly significant during the liquidity crisis of 2008 - the time the auctions failed. As noted by the Fund, Credit spreads widened to levels not seen in years. N-CSR, June 26, 2008, at 1, 3. Perpetually good financing in such a climate was clearly of significant value to the common shareholders.

(c)     The constraints on the Fund from the ARPS were minimal. The Fund did not have to offer any collateral, and it only had to have $2 in gross assets for every $1 in ARPS outstanding.

16.     In addition, a key aspect of the Fund's performance on behalf of its common shareholders was due to financial leverage (*i.e.*, the difference between the low rates paid by the Fund on its ARPS and the returns it would realize on its portfolio investments.) *See, e.g.,* N-CSR, June 26, 2008 at 30 (advertising as a "Potential Advantage of Closed-End Fund Investing" the "Ability to Put Leverage to Work"). The effect of this leverage was reflected in the Fund's regular cash distributions to common shareholders and described in the Fund's regular reports to its shareholders. The Fund's public statements indicated that the holders of its common stock

6

could realize, as one of the significant benefits of this investment, leverage that would continue indefinitely, since the ARPS were perpetual.

### (ii) The Calamos Closed-End Fund Business Model

17. Defendant Calamos Advisors, LLC ("CAL"), an affiliate of Defendant Calamos Asset Management Corporation ("CLMS"), has been the Fund's investment advisor at all relevant times. CAL, CLMS, and their affiliates (referred to herein as the "Calamos Sponsorship Group") sponsored a number of closed-end investment companies ("closed-end funds") similar to the Fund, five of which also issued auction rate securities that were similar to the ARPS.[1]

18. By sponsoring closed-end funds that issued ARS, the Calamos Sponsorship Group raised billions of dollars in capital and realized hundreds of millions of dollars in revenue through various management fees and other items of compensation. To distribute the funds, the Calamos Sponsorship Group relied heavily on the investment banks and brokers who sold the funds to investors and who also sold ARS to investors.

19. In addition to serving as Trustees of the Fund, the individually-named Defendants (the "Individual Defendants") served in similar capacities on behalf of a large number of other funds (the "Sister Calamos Funds") sponsored by the Calamos Sponsorship Group. The following table summarizes the number of Calamos sponsored funds on which each Individual Defendant serves (or served) as trustee or director, and the most recent approximate aggregate annual compensation received by each Individual Defendant from those funds, based on the information filed with the SEC:

---

[1] The term "Auction Rate Securities" ("ARS") generally refers to either municipal or corporate debt securities with a long term maturity or preferred stocks that return a yield at rates set at periodic auctions. With a minimum investment of $25,000, these securities were typically held by high net worth individuals and entities.

| Defendant | Number of Calamos Funds | Most Recent Aggregate Annual Compensation From Management of the Fund |
|---|---|---|
| Weston W. Marsh | 20 | $140,000 |
| Joe F. Hanauer* | 20 | $143,000* |
| John E. Neal | 20 | $160,000 |
| William R. Rybak | 20 | $138,000 |
| Stephen B. Timbers | 20 | $186,000 |
| David D. Tripple | 20 | $150,000 |
| John P. Calamos, Sr. ** | 20 | $** |

* Defendant Joe F. Hanauer stepped down as a Trustee on December 31, 2009. The numbers for Defendant Joe F. Hanauer reflect his last full fiscal year as a Trustee (the fiscal year ending Oct. 31, 2008).

** Defendant John P. Calamos, Sr. is an employee of the Calamos Sponsorship Group and is not separately compensated for his board service.

20.    The Fund and its common shareholders did not have an economic interest in any of the other members of the Calamos Sponsorship Group, nor did they benefit from the ability of the Calamos Sponsorship Group to continue to sponsor new closed-end funds.

21.    The Calamos Sponsorship Group, on the other hand, had a significant interest in sponsoring new funds, so that it could grow its business. The Individual Defendants stood to gain additional board seats and management fees for each new fund sponsored by Calamos.

22.    The Individual Defendants and the Calamos Sponsorship Group managed the funds in a way that reflected their shared economic self-interests and put those interests over the distinct interests of the separate closed-end funds, even though they owed distinct fiduciary obligations to each. As a result, the Defendants were able to collect fees from a number of funds

8

with little or no incremental burden on their time for each fund. This management approach also created an incentive for the Fund's directors to advance their own and the Group's interests even if those interests conflicted with the interests of the Fund's common stockholders.

### B. Defendants' Misconduct
### (i)The Collapse of the ARS Market

23. By early 2008, over $50 billion in ARS issued by closed-end funds were outstanding. ARS typically had a very long maturity or, as in the case of the ARPS issued by the Fund, no maturity date and typically gave the holders no redemption right. However, so long as the regular auctions functioned, ARS holders had a way to liquidate their investment. Accordingly, many broker dealers recommended ARS as a vehicle for short term investing.

24. Auctions were regularly held (typically held every 7, 28, or 35 days), with interest paid at the end of each auction period. However, an auction could fail if there were insufficient buyers to buy the ARS from the sellers. As already noted, the offering documents for ARS typically specified a formula that would set the interest or dividend rate to be paid when auctions fail.

25. Beginning February 13, 2008, auctions consistently failed. As a result, the ARPS issued by the Fund became illiquid. The auctions have continued to fail since. This liquidity crisis caused many ARS holders to demand that their investment banks and brokers repurchase their ARS. Ultimately, many of these investment banks and brokers did purchase ARS from their clients in settlements concluded with government agencies. These settlements imposed significant liabilities on the investment banks and brokers, which would have been much higher if the Fund did not redeem the securities from the ARPS holders. On information and belief, the Calamos Sponsorship Group believed that the investment banks would not desire to acquire the securities themselves.

9

### (ii) Defendants' Redemption of the ARPS

26. The failure of the auction mechanism should not have had any impact on the Fund or its common shareholders. The Fund was not obligated to redeem ARPS, nor did the auction failures materially adversely affect the Fund's rights and obligations with respect to the ARPS. Indeed, the Fund issued the ARPS under a prospectus that listed auction failure as a potential risk for ARPS holders, which specifically stated: "If an auction fails you may not be able to sell some or all of your shares," and "The Preferred Shares are not redeemable by the Fund's shareholders.," 2003 Prospectus, at cover page and 6. Moreover, the terms of the ARPS contemplated that auctions might fail, and they provided a mechanism for setting dividend rates in that situation. Under the terms of the ARPS, the interest rate would be determined by a formula, and, in all other respects, the ARPS would continue to be governed by the same terms as those that applied from the date of issuance.

27. Even though the failure of the auctions did not trigger any redemption obligation on the Fund (or otherwise create a valid business reason for the Fund to redeem the ARPS), the Defendants nonetheless caused the Fund to redeem approximately 81.4% of all outstanding ARPS (approximately $350 million) between June 2, 2008, and June 26, 2008, at their issue price of $25,000 per share. Defendants then replaced the ARPS with new financing that was less advantageous for the common shareholders. As a result, the remaining 3200 shares of ARPS had the right to vote for two of the Fund's seven directors, effectively increasing by more than 3 times the voting power of each preferred share compared to the common shares. Then, between August 13, 2009 and August 24, 2009, the Defendants caused the Fund to redeem all then-outstanding ARPS, again at their issue price of $25,000 per share, and again to replace the redeemed ARPS with financing that was less advantageous for the common shareholders.

28. The same investment banks and brokers who marketed the ARS and ARPS were a key part of the business model of the Calamos Sponsorship Group: the Calamos Sponsorship Group earns fees by sponsoring new funds and the investment banks and brokers market the common shares of those funds. Consequently, the Calamos Sponsorship Group relies heavily on good relationships with the investment banks and brokers to enable them to market new funds and earn fees for the management of those funds. Indeed, the CAM report on Form 10-K for 2009 lists as a risk factor:

> [A] majority of our assets under management were attributable to accounts that we accessed through third-party intermediaries. These intermediaries generally may terminate their relationships with us on short notice.

On information and belief, the Defendants caused the redemption of the ARPS to provide liquidity to the holders of the ARPS and appease their investment banks and brokers (who would thereby be protected from further liability for the illiquidity of the ARPS). This strategy apparently worked. As noted in CAM's Summary Annual Report to shareholders: "In this dramatically changed market environment, we have been able to retain and, in many cases, grow our shelf space at key partner firms."

29. Meanwhile, the redemptions by the Fund of the ARPS damaged the Fund's common stockholders by denying them the financial benefits associated with the ARPS, diluting the economic value and, for some periods, the voting power of the common shareholders. The redemptions thus favored one class of shareholders over another, in violation of the duties of the Individual Defendants toward the disadvantaged shareholders.

30. Moreover, the Defendants caused the Fund to redeem the ARPS at prices that exceeded their market value. Even though the ARPS were then trading on the secondary market at a significant discount to its issue price of $25,000, the Individual Defendants nevertheless

caused the Fund to pay the full issue price for the shares that it redeemed. The redemption was consequently dilutive to the common shareholders. (*see In re Calamos Convertible Opportunities and Income Fund et al.*, Convertible and High Income Fund Amendment No.4 Amending and Restating the Application for an Order Pursuant to Section 6(c) of the Investment Company Act (hereinafter the "Fourth Amended Application") at 8 n.l.

31.    The Individual Defendants had to arrange new debt financing (the "First Replacement Borrowing") in order to fund the partial redemptions of ARPS. This Borrowing was so disadvantageous that it was replaced the next year from three sources: issuance of additional common stock, diversion of cash generated by the Fund's investments to pay down debt rather than make distributions to common shareholders, and yet another debt facility (the "Second Replacement Borrowing"; together with the First Replacement Borrowing, the "Replacement Borrowing").

32.    As detailed below, both the First Replacement Borrowing and the Second Replacement Borrowing were disadvantageous compared with the ARPS, for various reasons.

33.    First, the effective costs of the Replacement Borrowing are higher. On information and belief, the effective cost of the Replacement Borrowing with all its terms, conditions, and fees will generally be higher than the Defined Rate on the ARPS. For instance, over the year leading up to October 31, 2009, and again over the six months leading up to April 30, 2010, on information and belief, the Fund paid over nine times as much for the Replacement Borrowing in interest and fees and "deferred debt structuring fees" as it would have paid for the ARPS over the same period at the Defined Rate.[2] N-CSR, June 26, 2008, at 26 n.7. For the year ending October

---

[2]  Plaintiff has estimated the cost of ARPS over this period by applying the Defined Rate and adding the 0.27% to reflect costs of maintaining auctions and rating agency fees, the values of fees given by the Fund in the last full year of successful auctions. Many auction agents have cut fees significantly since auctions began to fail. The Defined

31, 2009 alone, the Fund paid interest and fees on the Replacement Borrowing that totaled approximately $12,126,125 on an average outstanding balance of $214 million, which equates to a fully loaded annualized rate of more than 5.65%. For the same period, the weighted average annualized dividend rate for the ARPS, applying the Defined Rate, was approximately 0.4%, and annual fees, on information and belief, were 0.26% or less for a total cost less than 0.6%. The Individual Defendants were well aware of the likelihood that the Replacement Borrowing would be more costly for the Fund.

34. Second, in contrast to the ARPS, which had a perpetual term, the term of the Replacement Borrowing was finite - only one year. The short-term maturity puts the Fund at enormous refinancing risk, as it was completely dependent on interest rate conditions and its ability to qualify for and obtain financing. The Defendants were well aware of the advantage of the ARPS. The Fund stated "[T]he perpetual nature of the [ARPS] makes them, in that respect, a more attractive source of leverage than borrowing, which by its terms must be repaid or refinanced at or before a stated maturity date." Fourth Amended Application at 34 n.21. Moreover, the Defendants recognized "these sophisticated lenders [of the Replacement Financing could] choose not to renew the loans and to recall their principal with any accrued interest ... [B]orrowings, unlike senior securities that are stock, typically must be repaid on a specific date in the future, which may present certain risks to common shareholders." *Id.* at 32. And, in fact, the short maturity of the First Replacement Financing forced the Fund to refinance its debt in a year that the Fund described as one in which "the cost of borrowing ... dramatically increased." N-CSR, December 29, 2008, at 3.

---

Rate is 150% of the "AA" Financial Commercial Paper Rate for comparable terms. Amended and Restated Statement of Preferences of ARPS, attached as Appendix A to 2003 Prospectus at A-3, A-18, A-27.

35.     Third, the additional constraints associated with borrowing increase the effective cost of the borrowing above the stated interest rate. *See, e.g.,* July 2003 Prospectus, at 45 ("[T]hese requirements will increase the cost of borrowing over the stated interest rate.") At least two significant additional constraints arose with the Replacement Financing.

> (a) *Collateral.* First, the Fund was not required to pledge its assets as collateral for the ARPS. In contrast, for the Replacement Borrowing, the Fund was required to pledge its assets as collateral. In addition, the Fund was at additional risk because the lender is permitted to borrow the collateral and relend it to third parties, so the Fund is at risk of default by those third parties.

> (b) *Coverage requirements.* The ICA imposes "coverage ratios" for various forms of leverage (*i.e.*, the Fund must have a certain amount of assets for every dollar it has in leverage). If the Fund cannot meet the required coverage ratio, under the ICA, it will be unable to pay dividends to the common shareholders.     The Fund acknowledges that common shareholders have a legitimate expectation of dividends. See Fourth Amended Application at 26 n.16. For the ARPS, under the ICA the Fund was obligated to maintain a coverage ratio, *i.e.,* total assets to total ARPS, of 2: I. For the Replacement Borrowing, the coverage ration was far higher, 3:1. N-CSR[3], December 29, 2008, at 6.

---

[3]  In the first amendment to its Exemption Application, the Fund suggested that the statutory coverage ratio might not apply to its debt. *In re Calamos Convertible Opportunities and Income Fund et al.*, Amendment No.1 Amending and Restating the Application for an Order Pursuant to Section 6(c) of the Investment Company Act, filed with the SEC on October 14, 2008, at 24-25 n. 14 (hereinafter "First Amended Application"). However, it gave the statutory coverage ratio as its reason for not redeeming more of the ARPS. Form N-CSR, December 29, 2008, at 6. It also represented that its debt agreements include a relaxation of contractual coverage requirements contingent upon the grant of relief requested. Fourth Amendment Application at 14.

After redeeming 81.4% of the ARPS, which increased the coverage requirement, the Individual Defendants caused the Fund to seek special relief from the requirements of the ICA applicable to debt, *see In re Calamos Convertible Opportunities and Income Fund et al.,* Application for an Order Pursuant to Section 6(c) of the Investment Company Act, filed with the SEC on July 24, 2008 (hereinafter "Calamos Application"), and pursued the application through four separate amendments dated October 14, 2008, December 18, 2008, January 12, 2009, and January 14, 2009. The Securities and Exchange Commission ("SEC") granted the relief for debt used to retire then-outstanding ARPS, with the relief to expire on October 31, 2010. *See In re Calamos Convertible Opportunities and Income Fund et al.,* Order Under Section 6(c) of the Investment Company Act of 1940 Granting An Exemption From Sections IS(a)(1)(A) and (B) of the Act, Investment Company Act Release No. 28615 (issued February 10, 2009), at 1. Consequently, $80 million of the Second Replacement Refinancing (and any subsequent refinancing of that debt) would benefit from this relaxed coverage requirement. The Fund paid down $41 million of this debt, leaving only a small fraction subject to the relaxed coverage requirement for the short period of relief remaining.

For any further borrowing, and, after October 31, 2010, for the borrowing already in place, the coverage ratio will require 50% more assets than would have been required to raise money with the same

amount of ARPS. The ARPS, once retired, cannot likely be replaced, see First Amended Application at 6, 7. The Fund views leverage as beneficial to the common shareholders, see N-CSR, December 30, 2009, at 4, and N-CSR, June 24, 2010, at 2. Indeed, as described in Paragraph 18, the ability to earn positive returns on leverage is one of the key elements of an investment in the common stock of the Fund. Yet the Defendants have unnecessarily constrained their ability to use leverage for the indefinite future and have acknowledged that the replacement of equity with debt may force deleveraging, Fourth Amended Application at 25-26.

36. While holders of the ARPS benefited significantly from the redemptions, the redemptions and the Replacement Borrowing caused significant damages to the common shareholders of the Fund for, inter alia, the reasons described in Paragraphs 33 - 35 above. As a result of the Defendants' conduct, the ARPS shareholders have unjustly benefited at the expense of the Fund's common shareholders.

37. The harm suffered by the common shareholders as the result of Individual Defendants' breaches of their duties owed to the common shareholders include:

(a) The dividends paid by the Fund to the common shareholders have been reduced because funds that would otherwise have been available to pay such dividends have been diverted to pay the increased costs associated with the Replacement Borrowing and/or to fund the redemption of ARPS;

(b) The dividends paid by the Fund to the common shareholders have further been reduced because, in connection with the unnecessary redemption of ARPS, the Fund's

16

overall leverage has been reduced, thereby producing less cash flow available to pay common stock dividends;

(c)     The potential future cash flows to be realized by holders of common stock, whether from dividends or other distributions, has been exposed to significantly greater risk as the result of the replacement of ARPS with the Replacement Borrowing and the resulting heightened risk of forced deleveraging at fire sale prices, particularly after the expiration of the regulatory relief on October 31, 2010;

(d)     The value of the Fund's common shares is lower than it would have been if the ARPS had not been redeemed.

## V. CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this class action pursuant to Rule 23, on behalf of itself and all other individuals who were the beneficial owners of common shares of the Fund at any time during the Class Period.

39.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, upon information and belief, there are well over five hundred (500) unrelated and geographically dispersed members of the proposed Class.

40.     There are questions of law or fact common to the class that exists as to all Class members. Among the questions of law and fact common to the Class are:

(a)     Whether the Individual Defendants caused the replacement of leveraging beneficial to the common shareholders in violation of their fiduciary duties to the common shareholders;

(b)     whether the Individual Defendants breached their fiduciary duties;

17

(c)     whether the Calamos Defendants aided and abetted the Individual Defendants' breaches of fiduciary duty;

(d)     whether the Calamos Defendants were unjustly enriched; and

(e)     whether Class members have suffered losses, and/or continue to suffer losses, and if so, the proper nature and measure of a remedy.

41.     Plaintiff's claims are typical of the claims of the remaining Class members, as the conduct of Defendants giving rise to the claims is identical as to all Class members, and the damages suffered by each Class member arise out of the same set of operative facts.

42.     Plaintiff will fairly and adequately protect the interests of the Class members, and has retained counsel competent and experienced in complex class action litigation. Plaintiff has no interests that are adverse to or which irreconcilably conflict with other Class members.

43.     The questions of law or fact common to the members of the Class predominate over any questions affecting solely individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## VI. CAUSES OF ACTION

### Count I - Breach of Fiduciary Duty
### (Against the Individual Defendants)

44.     Plaintiff incorporates herein the allegations set forth above.

45.     At all times alleged herein, the Individual Defendants, as trustees to the Fund, owed Plaintiff and the Class fiduciary duties, which duties include:

- the duty not to unfairly favor the interest of one class of shareholders over another;

18

- the duty not to cause one class of shareholders to receive a benefit greater than that to which they are entitled at the expense of another class of shareholders,

- the duty not to engage in conduct that reduces the common shareholders' realized benefits in an investment in the Fund.

- the duty not to engage in conduct that puts their own self-interest ahead of the interests of their fiduciaries.

46. In contravention of these duties the Individual Defendants caused one group of shareholders to receive a benefit to which they were not entitled at the expense of another group of shareholders: specifically, the ARPS shareholders were not harmed but benefited while Plaintiff and the Class as disadvantaged common shareholders suffered distinct injuries, and chose to cause the Fund to partially redeem the ARPS and replace it with unfavorable debt financing, thus eliminating one of the major benefits of the investment.

47. As a direct and proximate result of these breaches of fiduciary duties by the Defendants, Plaintiff and the Class have suffered damages in multiple millions of dollars.

48. Plaintiff and the Class are entitled to: (i) declaratory relief and preliminary and permanent injunctive relief requiring the Individual Defendants to properly carry out their fiduciary duties; and (ii) monetary relief, including punitive damages to the extent authorized by law, in an amount to be proven at trial based on Plaintiffs losses alleged herein.

## Count II - Aiding and Abetting a Breach of Fiduciary Duty
## (Against the Calamos Defendants)

49. Plaintiff incorporates herein the allegations set forth above.

50. At all times alleged herein, the Calamos Defendants, through their role as either investment adviser or through their contractual relationships and extensive communications with

the Individual Defendants, knew, or reasonably should have known, that the Individual Defendants were fiduciaries to the Plaintiff and the Class and had duties to act in the Class' best interests.

51. The Calamos Defendants nonetheless willfully and knowingly encouraged and participated in the Individual Defendants' breaches of fiduciary duty, as set forth above. In particular, the Calamos Defendants aided and abetted the Individual Defendants' fiduciary breaches by encouraging the Individual Defendants to engage in the conduct complained of herein.

52. As a direct and proximate result of the Calamos Defendants' aiding and abetting the Individual Defendants' breaches of fiduciary duty, Plaintiff and the Class suffered millions of dollars in damages.

53. Plaintiff and the Class are entitled to declaratory relief and preliminary and permanent injunctive relief requiring the Calamos Defendants to cease aiding and abetting the Individual Defendants breaches of fiduciary duty, to cease serving as adviser to the Fund, and to cease serving as administrative agent of the Fund, and awarding monetary relief, including punitive damages to the extent authorized by law, in an amount to be proven at trial.

## Count III - Unjust Enrichment
### (Against the Calamos Defendants)

54. Plaintiff incorporates herein the allegations set forth above.

55. Plaintiff and the Class assert a claim for unjust enrichment against the Calamos Defendants under the common law of Delaware.

56. By means of the wrongful conduct alleged herein, the Calamos Defendants have been unjustly enriched to the unjust detriment of the Plaintiff and the Class.

20

57. The Calamos Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein. Specifically, the enrichment of the Calamos Defendants has come in the form of fees and other revenues received by them from the Fund and from other Calamos Sister Funds as the result of the inequitable conduct complained of herein, including their encouragement of the Individual Defendants' breaches of fiduciary duty owed to Plaintiff and the Class. For example, the Calamos Defendants have received substantial fees from the Fund in connection with the Replacement Borrowing, and have realized significant revenues from the continued operation of their fund business model described above, which was facilitated by the Individual Defendants' breaches of fiduciary duty described herein.

58. The damages suffered by Plaintiff and the Class include, without limitation, the injury to their investment in the Fund resulting from Defendants' conduct complained of herein, and the elimination of the benefits to the Plaintiff and the Class of an investment as common shareholders in the Fund.

59. It would be inequitable for the Calamos Defendants to be permitted to retain the benefits they received, and are still receiving, unfairly and without justification, at the expense of Plaintiff and the Class.

60. The financial benefits derived by the Calamos Defendants rightfully belong to Plaintiff and the Class members. The Calamos Defendants should be compelled to disgorge their ill-gotten gains to a common fund for the benefit of Plaintiff and the Class members.

61. Plaintiff and the Class are entitled to declaratory relief and preliminary and permanent injunctive relief requiring the Calamos Defendants to disgorge their ill-gotten gains as alleged herein.

## VII. PRAYER FOR RELIEF

21

WHEREFORE, Plaintiff prays for a judgment:

A. Declaring that the Individual Defendants have breached their fiduciary duties owed to Plaintiff and the Class;

B. Declaring that the Calamos Defendants aided and abetted the Individual Defendants' breaches of fiduciary duty, as set forth above;

C. Declaring that the Calamos Defendants have been unjustly enriched by its actions alleged herein;

D. Enjoining the Calamos Defendants from serving advisors or otherwise earning fees for services to the Fund;

E. Enjoining the Individual Defendants from breaching their fiduciary duties owed to Plaintiff and the Class in the future;

F. Awarding monetary relief against the Defendants, jointly and severally, in the full amount of all losses suffered by Plaintiff and the Class as a result of the breaches of fiduciary duties by the Individual Defendants, and the Calamos Defendants' aiding and abetting of the Individual Defendants' breaches of fiduciary duty, together with pre-judgment and post judgment compounded interest at the maximum possible rates, whether at law or in equity and punitive damages;

G. Awarding attorneys' fees and expenses pursuant to the common fund doctrine and other applicable law; and

H. Granting all such other and further relief, general or special, legal or equitable, including punitive damages, to which Plaintiff and the Class.

Dated: August 13, 2010
New York, New York

22

**POMERANTZ HAUDEK
GROSSMAN & GROSS LLP**

By: _____
　　　Patrick V. Dahlstrom

10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile: 312-377-1184
pvdahlstrom@pomlaw.com

**POMERANTZ HAUDEK
GROSSMAN & GROSS LLP**

Marc I. Gross
Murielle J. Steven
Jeremy A. Lieberman
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone: 212-661-1100
Facsimile: 212-661-8665
migross@pomlaw.com
mjsteven@pomlaw.com
jalieberman@pomlaw.com

*Attorneys for Plaintiff*